Date signed October 18, 2007



*James F. Schneider*
**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| HALEY F. ADAMS, | * | Case No. 06-16027-JS |
| Debtor | * | Chapter 7 |

\* 　\* 　\* 　\* 　\* 　\* 　\* 　\* 　\* 　\* 　\* 　\* 　\*

### *MEMORANDUM OPINION GRANTING MOTION OF THE UNITED STATES TRUSTEE TO DISMISS BANKRUPTCY CASE FOR ABUSE*

This matter came on for hearing upon the motion of the United States Trustee to dismiss for abuse, pursuant to 11 U.S.C. § 707(b)(1) and (b)(3). For the reasons stated, the motion to dismiss will be granted.

### *FINDINGS OF FACT*

1. On September 30, 2006, the debtor, Haley F. Adams ("Ms. Adams"), filed the instant Chapter 7 petition in this Court.

2. Ms. Adams has had no income of her own since May 2004. On Schedule I, she listed the income of her husband, Dr. Nael Adams ("Dr. Adams"), as $10,471.66

per month. After taxes and other payroll deductions, Dr. Adams' net monthly income totals $7,724.46.

3. Dr. Adams testified that his main occupation is as a staff physician for Johns Hopkins University. He also testified that he would be capable of earning a substantially higher salary if he were promoted to Associate Professor and an even greater salary if he entered the private practice of medicine.

4. On Schedule J, Ms. Adams listed monthly expenses of $11,745.74. This figure included a monthly mortgage payment of $6,581, a monthly payment to Chase Auto Finance of $1,229, and a monthly payment to Mercedes Financial of $655. The three expenses alone total $8,465 per month, which represents more than 109% of the net monthly income of the debtor's household.

5. Ms. Adams scheduled $1,439,440 in assets, including her residence at 8517 Huntspring Drive, Lutherville, Maryland, which is owned by herself and her husband as tenants by the entireties. She assigned a fair market value to the residence of $1.3 million. In addition, Ms. Adams scheduled $139,440 in personal property owned jointly with her husband (including $80,370 in household goods and furnishings,[1] $8,000 worth of paintings and artwork, $7,500 in a checking account, and $3,900

---

[1] The $80,370 in household goods includes $18,000 in sofas and couches, $11,000 in window coverings, a $4,000 refrigerator, a $5,000 piano, a $2,500 oven, and a $2,000 microwave.

worth of jewelry). She also listed among her assets a $25,000 lender liability lawsuit which the debtor filed against Cendant Mortgage Corporation, which she also claims she jointly owns with her husband as tenants by the entireties.

6. The debtor's scheduled debts total $1,062,929. The major debt is a secured debt of $975,000 on the residence. The debtor also listed unsecured debts in the total amount of $87,929. Of ths amount, $68,320 is owed to 15 credit card companies. Towards what purpose the charges were for, the debtor's Schedules only disclose that they were used for "miscellaneous purchases on retail credit account." However, the debtor and her husband both testified that some of the credit card debt was used to pay off a mortgage on their residence. Another $19,449 in unsecured debt is owed to DaimlerChrysler Financial Services for breach of contract on a motor vehicle that was repossessed. The remaining $160 is owed to Ms. Adams' gym and cellular phone service provider.

7. Ms. Adams listed two minor children as dependents.

8. The debtor was formerly employed as an orthoptist at an annual salary of $40,000. In October 2003, she was involved in an automobile accident, which she testified caused her headaches so extreme that she left her employment in May 2004. On November 1, 2006, Ms. Adams filed a lawsuit based on this accident, in which she

alleged $5,000 in personal injuries to herself and $5,000 in personal injuries to her children.

9. On April 17, 2004, Dr. And Ms. Adams entered into a contract for the construction and purchase of a residence located at 2709 Merryman's Mill Road, Phoenix, Maryland ("the Merryman's property"), for $727,000, for which they obtained financing in the amount of $617,950.

10. In May 2004, they moved into the house. By June 2004, the couple had moved out of the house, citing numerous problems with its construction, most notably the presence of live electrical wires in the backyard that Dr. and Ms. Adams believed represented a dangerous condition. They decided to sell the residence and resided temporarily in hotels and an apartment until they found a new home.

11. On August 20, 2004, the couple took out an additional loan of $150,000 against the Merryman's property.

12. On August 30, 2004, the couple purchased a new house that is their current residence, for a purchase price of $950,000, for which they borrowed an additional $854,610, via two separate loans.

13. It was not until July 12, 2005, that the Merryman's property was sold at private sale for a price of $804,000, from which the couple made a profit of $77,000. However, both Dr. and Ms. Adams testified that they struggled financially from

having to pay two mortgages for a number of months. They used the sale proceeds to pay off the first mortgage.

14. On March 14, 2006, the couple refinanced the debt on their current residence, obtaining a $975,000 loan and paying off the existing mortgages (the balance of which had increased to $862,676.26), as well as settlement charges of $12,857.52. They took $99,467 in cash out of the refinancing settlement. The monthly payment on the new mortgage was $6,581, which represents 85% of the couple's monthly net income.

15. At the hearing before this Court on September 24, 2007, the U.S. Trustee presented photographs of the Huntspring residence, from which this Court has determined the debtor's residence to be palatial in nature, and beyond the means and needs of the debtor's family.

16. The couple used the loan proceeds to pay off Dr. Adams' credit card debts as well as the couple's joint debts. They testified that this was part of an attempt to boost Dr. Adams' credit score to enable him to renegotiate his loan under more favorable terms.

17. Meanwhile, the couple continued to purchase personal property on credit, which the debtor claimed as exempt because it was jointly held with her husband.

18. In July 2005, a Mercedes Benz C Class vehicle was repossessed from the debtor. After the repossession, she leased a new Mercedes Benz for a monthly lease payment of $1,225.

19. The couple also paid $655 a month for a BMW X5 sport utility vehicle ("SUV").

20. The debtor and her husband enjoyed a lavish lifestyle through the use of Ms. Adams' credit cards. She testified at her deposition that she used her credit cards to purchase items for her children, to have dinner at restaurants three times a week with her family and to purchase groceries for her family at an approximate cost of $500 per week.

21. Dr. and Ms. Adams insisted that they acted on the advice of a financial advisor.

*CONCLUSIONS OF LAW*

1. This Court has subject matter jurisdiction over the instant motion to dismiss, which is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Section 707(b)(1) of the Bankruptcy Code provides that "[a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily

consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Section 707(b)(3) provides that "[i]n considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption... the court shall consider (A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3).

3. The test adopted by the Fourth Circuit to determine whether the totality of the circumstances demonstrates abuse was delineated in *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991). In *Green*, it was held that a finding of abuse should consider the debtor's ability to repay his debts, as well as

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

       (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

       (5) Whether the petition was filed in good faith.

*In re Green*, 934 F.2d at 572 .[2] The Court finds that five out of the six factors apply in this case, as follows.

    4. The first factor is the debtor's ability to repay her debts. The Court finds that Ms. Adams has the ability to repay her debts. In determining ability to repay, every reported case agrees that if the debtor herself has no income, the Court must take into account the income of the debtor's non-filing spouse when the spouse receives significant income. *See In re Travis*, 353 B.R. 520, 530 (Bankr. E.D. Mich. 2006) (finding that the Court should consider a non-filing spouse's income when it is "substantial enough to significantly raise the debtor's standard of living and generate total household income in excess of the reasonable costs of food, clothing, shelter, and other necessities"); *In re Welch*, 347 B.R. 247 (W.D. Mich. 2006) (not taking into account the income of non-filing spouse when incomes were approximately equivalent); *In re Staub*, 256 B.R. 567, 571 (Bankr. M.D. Pa. 2000) (considering non-

---

[2]Because Ms. Adams debts were so great there is no presumption of abuse under the "means test" of 11 U.S.C. § 707(b)(2)(A). In the absence of a presumption of abuse, the Court need not decide whether the BAPCPA amendments abrogate the method of determining "totality of the circumstances" enunciated in *In re Green*, *supra*. *See In re Henebury,* 361 B.R. 595, 605 (S.D. Fla. Mar. 16, 2007).

filing spouse's income when it was "so great that it could pay off the entirety of [filing spouse's] unsecured debt in a matter of months"). *Contra, In re Baldino,* 369 B.R. 858 (M.D. Pa. June 14, 2007) (non-filing spouse's income is considered only to extent it contributes to household expenses of the debtor or debtor's dependents).

5. Because the income of the debtor's husband represented the only income devoted to the debtor's household expenses, including the payments on the mortgage and on the family car, and because that income was far less than these expenses, Dr. Adams' income must be considered even under the stricter test of *Baldino*.

6. Taking into account her husband's income, the Court finds that the debtor would be able to repay her debts if she had a reasonable budget.

7. The Court further finds that it is not reasonable to pay $6,581 per month in mortgage payments and $1,884 per month in car payments with a monthly net income of $7,740.46.

8. The second factor is whether the bankruptcy case was filed because of "sudden illness, calamity, disability or unemployment." *In re Green, supra*. This Chapter 7 bankruptcy case was not filed for any of these reasons. In *Shaw v. U.S. Bankruptcy Adm'r*, 310 B.R. 538 (M.D. N.C. 2004), the court weighed this factor against the debtor, who was faced with unemployment about which she had significant warning, because the unemployment was not sudden. *Id*. at 540.

9. Likewise, the poor condition of the Merryman's property combined with the Adamses' inability to sell it was neither sudden, nor was it a calamity. The word "calamity" contemplates a catastrophic event and not the mere inability to sell a property. Even if the term were applicable to the couple's inability to sell the Merryman's property for slightly more than a year, that inability hardly qualifies as a calamity, considering that the property was sold for a substantial profit of $77,000. The Court finds that any financial hardship the Adamses suffered during the time the Merryman's property was on the market was caused by their extravagant lifestyle and not merely by their inability to sell the property.

10. The third factor is whether the debtor incurred consumer expenses beyond her ability to repay. Indeed, Ms. Adams incurred large consumer expenses, which, while not beyond her ability to repay, are beyond her ability to repay under her current budget.

11. The fourth factor is the debtor's proposed budget. As described above, Ms. Adams' proposed family budget is excessive and unreasonable. The Court need not rehash every line item in the debtor's Schedule J. Suffice it to say, a budget based on $7,740.46 net income that contains a $6,581 monthly mortgage payment and two car payments totaling $1,884 a month is unreasonable on its face.

12. The fifth factor is the debtor's honesty. There is no evidence of any dishonesty on the part of the debtor in the preparation of any part of her petition. The Court finds that the debtor's schedules and statement of current income and expenses reasonably and accurately reflect her true financial condition. However, the debtor's honesty does not outweigh the other indicia of abuse which the Court has found.

13. The sixth and final factor is the debtor's good faith. The Court finds that the instant petition was not filed in good faith. The debtor and her husband have engaged in acts designed to hinder, delay and defraud creditors. They have built up debts in Ms. Adams' name in order to invest in assets exempt from creditors under state law or to reduce Dr. Adams' debt load. The assets in which the Adamses have invested are exempt either because they are jointly owned, owned individually by Dr. Adams, or because they are exempt under Maryland state law. One example is the use of the debtor's credit cards to pay off the couple's jointly-held mortgage. She built up her individual debt in order to discharge it in bankruptcy. She invested this debt in building equity in the jointly-owned residence, which is thereby exempt from the claims of her individual creditors. She and her husband also paid down all of his credit card debts, ostensibly to strengthen his credit rating. This amounts to bad faith, despite the claim that the couple relied on an unnamed financial advisor. The fact that one had financial advice does not negate bad faith when the Court finds the presence

of an intent to defraud creditors. The fact that the couple lived such a lavish lifestyle up to and during their bankruptcy also weighs against a finding of good faith. *See In re Oot*, 368 B.R. 662, 680 (N.D. Ohio Mar. 19, 2007) (quoting *Kornfield v. Schwartz (In re Kornfield)*, 164 F.3d 778, 781 (2d Cir. 1999)) ("[t]his is a paradigm of the case that Section 707(b) was designed for: debtors enjoying a substantial income but seeking to transfer the cost of an unnecessary lifestyle to creditors."); *see also U.S. Trustee for the Western Dist. of Va. v. Harrelson*, 323 B.R. 176, 179 (W.D. Va. 2005).

14. The Court holds that residing in a $1.3 million dollar residence, driving a luxury car with lease payments of $1,225 a month, and otherwise not conforming to a reasonable budget while filing a Chapter 7 bankruptcy case to support such a lavish lifestyle on the backs of creditors amounts to bad faith. Therefore, the Court finds from the totality of circumstances that the filing of the instant case represented an abuse of the bankruptcy system, requiring its dismissal.

WHEREFORE, the motion to dismiss for abuse will be GRANTED.

ORDER ACCORDINGLY.

cc:  Mark A. Neal, Esquire
Katherine A. Levin, Esquire
Hugh Bernstein, Esquire
Office of the United States Trustee
U.S. Courthouse, Suite 2625
101 West Lombard Street
Baltimore, Maryland 21201

Ms. Haley F. Adams
P.O. Box 988
Brooklandville, MD 21022-0988
Debtor

John K. Burkhardt, Esquire
John K. Burkhardt, P.A.
28 Allegheny Ave., Suite 500
Towson, MD 21204-3911
Counsel to the Debtor

David E. Rice, Esquire
Venable LLP
1800 PNC Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201
Chapter 7 Trustee